UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SARA TUCKER, | Case No. 17-CV-3669 (PJS/KMM) |
| Plaintiff, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

Robert N. Edwards, for plaintiff.

Ana H. Voss, UNITED STATES ATTORNEY'S OFFICE, for defendant.

Plaintiff Sara Tucker brought this action against defendant United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), for injuries that she suffered in a collision with a vehicle driven by a mail carrier. Both parties agree that the United States is liable to Tucker, and both parties agree that the United States must pay past medical expenses in the amount of $9,718.43. The parties dispute how much the United States must pay Tucker for (1) future medical expenses; (2) past pain and suffering; and (3) future pain and suffering.

Tucker's claim was tried before the Court. Having heard the evidence and arguments of counsel, the Court makes the following findings of fact and conclusions of law under Fed. R. Civ. P. 52(a).

I. FINDINGS OF FACT

*A. Background*

1. Tucker is 34 years old and works as a nurse at the Maple Grove Hospital in Maple Grove, Minnesota. TT 15, 58.[1]  Before the accident, Tucker was healthy and led an active life. TT 15-16. Tucker and her husband have one child and, at the time of trial, were expecting a second child. TT 18, 34.

2. Tucker timely filed a complaint on August 10, 2017. ECF No. 1.

*B. The Accident*

3. On May 27, 2014, an employee of the United States Postal Service negligently crashed his vehicle into Tucker's car as she was driving home. TT 13-15; JE 660-63.

4. Immediately after the accident, Tucker felt "sharp pain" in her head and neck. TT 13. An ambulance arrived and transported Tucker to the emergency room at Mercy Hospital in Coon Rapids, Minnesota. TT 13-14; JE 574. A doctor ordered CT scans of Tucker's head and cervical spine; the scans were normal. TT 187, 190-91; JE 574, 577-78. After the doctor diagnosed Tucker with a headache, neck pain, and dizziness, JE 574, she was given pain medication and instructed to follow up with a primary-care physician, TT 19.

---

[1] The Court cites to the trial transcript as "TT __" and to the joint exhibits as "JE __."

5. The Court finds that Tucker was a credible witness. She appeared to testify truthfully about the accident and the pain that she has experienced since May 2014. There is no reason to believe that Tucker has been malingering or exaggerating. Several witnesses described how the accident has affected Tucker, and their testimony corroborated Tucker's. *See* TT 86 (co-worker testifying that the accident has changed how Tucker works as a nurse); TT 76-78 (husband testifying that the accident has "affect[ed] her whole life" by causing pain and forcing her to give up certain activities).

6. Since the accident, Tucker has experienced chronic mild-to-moderate pain. The pain has not had a debilitating impact on Tucker's life. Tucker can still perform her daily activities, TT 43-44; she can still work as a nurse, TT 58; she has become pregnant, given birth to a child, helped raise the child, and become pregnant again, TT 18, 40-42; and she regularly drives to Iowa to visit her parents, TT 37-38, 61.

That said, Tucker does suffer from chronic pain—and all the frustration and stress that typically accompany chronic pain. Tucker's pain waxes and wanes; Tucker occasionally experiences stiffness, burning, tingling, headaches, and neck discomfort. TT at 20-21. Tucker's injury can make it difficult for her to complete basic activities such as mowing the lawn, cooking food, and shoveling the driveway, TT 30-32, 61-62, and she has given up some of her hobbies, such as gardening, TT 35, 76, 79. At times, the pain has made it harder for Tucker to care for her family. TT 40-41.

*C. Treatment History*

7. From June 2014 to November 2015, Tucker tried different types of non-invasive pain treatment. On three separate occasions, Tucker participated in physical-therapy courses involving outpatient treatment and at-home exercises. All told, Tucker attended over 50 physical-therapy sessions from June 2014 to May 2017. *See* TT 67-68 (testifying that her first and second rounds of physical therapy involved between 40 and 50 visits combined); TT 52-53 (testifying that her third round of physical therapy involved 11 sessions); *see also* JE 191-92. Tucker also tried a handful of other treatments, including massage therapy, chiropractic care, TENS units,[2] and a corticosteroid injection. TT 21-22, 25-26, 53; *see* JE 533-64.

8. None of these treatments brought lasting pain relief. TT 23-26 (physical therapy, TENS unit, trigger point injection). Although physical therapy brought temporary relief, Tucker's symptoms—headaches, "aching" and "stabbing" neck pain, and tingling in her left little finger—reappeared after treatment ended. *See, e.g.*, TT 24-25 (testifying that her pain would gradually return after attending physical therapy).

---

[2]Transcutaneous electrical nerve stimulation ("TENS") therapy involves using electrical currents to treat pain. A patient using a TENS unit places electrodes on the painful area, and the unit's battery pack delivers an electrical current in order to stimulate the nerves. *See* TT 199-200.

*D. New Diagnosis and Radiofrequency Ablations*

9. Frustrated with these results, Tucker explored other treatment options. In November 2015, she visited a chronic-pain specialist at the Institute for Low Back and Neck Care. TT 27; JE 1051-52. The doctor recommended that Tucker go through a diagnostic procedure known as a "medial branch block"[3] to determine whether a treatment known as "radiofrequency ablation" (or "RFA") might reduce or eliminate her pain. TT 27-28; JE 1052.

10. RFA is a widely accepted, minimally invasive surgical procedure designed to treat facet-joint pain. RFA provides pain relief by burning the nerves within the damaged facet joints. *See* TT 99, 116. A doctor uses a special needle with a heated tip to coagulate the proteins within the nerve so that the nerve can no longer transmit pain signals. TT 99, 116. Over time, the nerve regenerates and can send pain signals once

---

[3]A medial branch block is a procedure used to diagnose facet-joint pain. (Facet joints are synovial joints—a type of joint, similar to a knuckle, that enables rotational movement.) These joints, which are innervated by medial branch nerves, can be damaged and cause pain. Doctors can make a "fairly precise diagnosis" of facet-joint injury by "blocking these nerves" with a local anesthetic. TT 98-99. "[I]f the pain is gone for the duration of the local anesthetic, [doctors] assume that the structure that [was] anesthetized is the source of the pain." TT 99.

The medial branch block takes place in two stages. During the "initial block," a doctor injects a small amount of a local anesthetic to numb the nerves that are connected to a particular facet joint. TT 99, 110. A week or so later, the doctor repeats this process on the same nerves. If the anesthetic provides relief "greater than 80 percent" for "the duration of the local anesthetic after each block," the doctor "can confirm the diagnosis of facet joint pain." TT 99.

again.  TT 116, 129-30.  For this reason, medical professionals view RFA as a "management strategy" rather than a "permanent cure."  TT 116.

11.  The Court credits the testimony of Tucker's expert, Dr. David Schultz, that RFA is a "common" and "fairly routine" procedure that is performed at "all interventional pain clinics," as well as at such world-renowned medical facilities as the Mayo Clinic.  TT 98.  The RFA procedure is backed by medical literature and extensive practice.  *See* TT 125-30.  Dr. Schultz alone has performed thousands of RFAs.  TT 98.  Dr. Schultz testified that, in his opinion, RFA is currently the *only* effective treatment for facet-joint injury.  TT 125.

12.  In January 2016, Tucker underwent her first medial branch blocks and RFA under the care of Dr. Steven Sabers.  TT 27-28.  The RFA provided significant pain relief.  After Tucker experienced nearly complete relief for five or six months, TT 29, 43-44, her pain gradually returned as her nerves regenerated, TT 43, 78.

13.  Tucker switched doctors in the summer of 2017.  Under the care of Dr. Schultz, Tucker received another set of medial branch blocks.  TT 112-13.  Dr. Schultz diagnosed Tucker with "whiplash syndrome" from facet-joint injuries.  TT 114.  Tucker received two more RFAs from Dr. Schultz, one in August 2017 and another in April 2018.  JE 36-39.  Both times, the procedure provided almost complete pain relief for a five- to seven-month period.  *See* TT 43-44.

*E. Expert Testimony*

14. The Court credits Dr. Schultz's testimony that the May 2014 accident is the cause of Tucker's chronic pain. TT 114.

15. The Court likewise credits Dr. Schultz's testimony that Tucker will continue to experience pain for the foreseeable future because of the May 2014 accident. TT 115.

16. Dr. John Sherman testified on behalf of the United States that Tucker does not need any more treatment for injuries from the accident. *See* TT 197. He points to her normal imaging results and positive responses to physical therapy as evidence that the damage caused by the accident was minor and has long since healed. TT 186-87. The pain that Tucker currently reports, he claims, is unrelated to the accident and probably just a "spontaneous onset of some neck pain and low back pain." TT 219.

17. The Court does not credit Dr. Sherman's account. Essentially, Dr. Sherman would have the Court believe that Tucker—a healthy, active young woman with no prior history of neck pain—coincidentally developed chronic neck pain shortly after being involved in a car accident. The Court rejects this theory and instead credits Dr. Schultz's explanation that Tucker's chronic pain is attributable to facet-joint injuries that were caused by the accident and that have not healed. As Dr. Schultz explained, the normal imaging results are not inconsistent with his diagnosis because facet-joint pathology does not always show up on imaging. TT 101.

18. Facet-joint injuries are unpredictable. Sometimes they heal spontaneously; other times, they never fully heal. TT 101-02. Dr. Schultz explained that facet joints that have not healed within two years after being injured are most likely permanently damaged. TT 115. Given that five years have gone by since Tucker's accident, the Court agrees with Dr. Schultz that it is more likely than not that Tucker's injury is a "permanent condition" that will "persist into the foreseeable future." TT 115.

### F. Future Medical Expenses

19. Predicting Tucker's medical needs over the rest of her life is very difficult, as Dr. Schultz conceded. TT 115. That is why *no* witness testified that Tucker will need RFAs for the rest of her life. Dr. Schultz testified that it is possible that Tucker will "get better over time" or even "recover." TT 123. Dr. Schultz also testified that he has "probably" had patients who have had RFAs done for as long as ten years; he could not recall any patients who have had RFAs done for a longer period of time. TT 123.[4]

---

[4] An expert witness in a similar case gave similar testimony regarding RFA:

> Dr. Turnipseed testified that a successful [RFA] procedure provides effective pain relief for at least six months and as long as a year. He also testified to medical literature supporting the undiminished effectiveness of annual [RFAs] for seven years. Dr. Turnipseed said that he has successfully used the procedure on patients ten years in a row, and that he would perform annual [RFAs] on Berry as long as they continued to be effective.

(continued...)

Based on the evidence, the Court finds that Tucker will likely experience pain indefinitely and that she will need to keep receiving RFAs. The Court finds it likely that Tucker will need to continue to receive RFAs for at least ten years. It is possible that Tucker may end up needing RFAs for more than ten years, but, based on the evidence in the record, the Court cannot make that finding by a preponderance of the evidence.

20. The Court finds that the present value of Tucker's future medical expenses is $62,693.40. The Court reaches this amount based on the assumption that Tucker will need an RFA once every eight months during the next ten years. Tucker submitted evidence that an RFA costs $4,425.00. Joint Exs. 24-25. This amounts to 15 RFAs, which will cost a total of $66,375.00 in 2019 dollars. The Court reaches its award for future medical expenses by adjusting this amount for inflation and discounting to present value.[5]

## II. CONCLUSIONS OF LAW

1. The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1346(b)(1).

---

[4](...continued)
*Berry v. Auto-Owners Ins. Co.*, 634 F. App'x 960, 962 (5th Cir. 2015).

[5]The Court takes judicial notice that, for purposes of calculating present value, the inflation rate—as of April 2019 when trial took place—was 1.96%, and the discount rate was 3%.

2. Tucker exhausted her administrative remedies as required by 28 U.S.C. § 2675(a).

3. Under the FTCA, Minnesota law applies and the United States is liable "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674; *Rayonier, Inc. v. United States*, 352 U.S. 315, 319 (1957) ("[T]he test established by the Tort Claims Act for determining the United States' liability is whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred.").

4. The United States is liable to Tucker for damages caused by the May 2014 accident. *See* TT 3.

5. Tucker bears the "burden of proving, by a preponderance of the evidence, damages caused by the defendant." *Rowe v. Munye*, 702 N.W.2d 729, 735 (Minn. 2005). She must "demonstrate with reasonable certainty the nature and probable duration of the injuries sustained," *id.*, and cannot recover for damages which are too "remote, speculative, or conjectural," *Pietrzak v. Eggen*, 295 N.W.2d 504, 507 (Minn. 1980).

6. Tucker is entitled to collect damages for "noneconomic detriment" (specifically, pain and suffering) because she suffers from a "permanent injury" for purposes of Minn. Stat. § 65B.51, subd. 3(b)(2).

### A. Past Damages

7. Based on its admission at trial, the United States owes Tucker $9,718.43 for past medical expenses.

8. Tucker is also entitled to recover damages for her past pain and suffering.

9. Placing a dollar value on "[a]ny variety of pain and suffering whether past, present, or future, is inherently indeterminate." *Steele v. Qualen*, No. C2-03-309, 2003 WL 21743757, at *4 (Minn. Ct. App. July 29, 2003). On many occasions, the Eighth Circuit has recognized that "awards for pain and suffering are highly subjective" and "not easily calculated in economic terms." *Townsend v. Bayer Corp.*, 774 F.3d 446, 466 (8th Cir. 2014) (citation and quotation marks omitted).

10. An award "for general damages, including pain and suffering," is "generally left to the discretion of the jury and trial court." *Busch v. Busch Constr., Inc.*, 262 N.W.2d 377, 398 (Minn. 1977). When calculating past damages for bodily and mental harm, Minnesota courts consider "[1] [t]he type, extent, and severity of the injuries; [2] [h]ow painful the injuries were; [3] [t]he treatment and pain involved in that treatment; [4] [t]he length of time the injury or harm lasted; and [5] [a]ny other [relevant factors]." 4A Minn. Prac., Jury Instr. Guides—CIVJIG 91.10: Items of Personal Damage—Past Damages—Bodily and Mental Harm (6th ed. 2018 update); *see Dawydowycz v. Quady*, 220 N.W.2d 478, 481 (Minn. 1974) ("In deciding the issue [of damages] the following

factors are relevant: past and future pain, permanent disability, life expectancy, ability of plaintiff to follow his usual occupation, loss of earning power, the effect on plaintiff's enjoyment of the amenities of life, degree of disfigurement, and the inflationary trend of the economy.").

11. From May 2014 until January 2016, Tucker dealt with chronic pain without receiving effective treatment. She had to suffer through headaches, neck pain, burning, and tingling. Although not disabling, her injuries—in addition to causing physical pain—made it more difficult to care for her family and to engage in activities that she formerly enjoyed. She gave up some of her hobbies (like gardening) because they caused her too much discomfort. Even after she started receiving RFAs in January 2016, she still experienced pain as her RFAs wore off. She was unable to get an RFA when she needed one because she was pregnant with her first child, which caused her to suffer even more.

12. Having considered all of the evidence introduced at trial and all of the relevant factors identified by the Minnesota courts, the Court concludes that $125,000 will fairly compensate Tucker for past pain and suffering.

### B. Future Damages

13. To recover damages for harm that will occur in the future, Tucker must show "(1) that the future harm is more likely than not to occur; and (2) that her future

damages are not too speculative." *Bryson v. Pillsbury Co.*, 573 N.W.2d 718, 721 (Minn. Ct. App. 1998). "There is no general test of remote and speculative damages, and such matters should usually be left to the judgment of the trial court." *Jackson v. Reiling*, 249 N.W.2d 896, 897 (Minn. 1977).

1. Medical Expenses

14. The Court finds that Tucker is entitled to recover $62,693.40 for future medical expenses, for the reasons described above.

In *Sipe v. Fleigles Transportation & Services, Inc.*, the Minnesota Court of Appeals affirmed an award for future medical expenses based on testimony similar to the testimony presented at Tucker's trial. No. A07-0699, 2008 WL 2020438 (Minn. Ct. App. May 13, 2008). In *Sipe*, the plaintiff sought damages to pay for annual RFAs to treat the pain that resulted from her permanent injury. *Id.* at *1-3. The court found that the plaintiff satisfied her burden of proving the need for medical treatment by presenting expert testimony that "the neurotomy procedure gave her pain relief and other treatment did not," "the relief from the procedure was not permanent," "she had undergone the procedure more than once after the effects of the procedure wore off," "she intended to continue with neurotomy treatments for as long as she experienced pain in her neck," and "her neck injury is permanent." *Id.* at *8.

As described above, Tucker has presented the same sort of evidence: She testified that RFA is the only treatment that provided effective and long-lasting relief; that her pain would slowly creep back; and that she had undergone RFAs on multiple occasions. Dr. Schultz also testified that Tucker's injury was likely permanent and that RFA is the only effective treatment for her. This type of evidence, which was sufficient to support a jury award for future damages in *Sipe*, likewise supports an award for future damages here. *See id.* (affirming award of $130,100 in future medical expenses to pay for RFA treatments).

2. Pain and Suffering

15. Tucker is also entitled to recover damages for her future pain and suffering.

16. Placing a dollar value on future pain and suffering is even more difficult than placing a dollar value on past pain and suffering. Past pain and suffering has already been experienced and can be described by the plaintiff. But no one—including the plaintiff—can know what kind of pain and suffering the plaintiff will experience going forward.

17. Under Minnesota law, "the peculiar facts of each case must serve to measure the damages." *Cameron v. Evans*, 62 N.W.2d 793, 799 (Minn. 1954). "There is no yardstick that can be applied to all cases." *Id.* Since "[n]o two cases are alike," no "particular purpose is served by comparing verdicts." *Id.* Thus, the Court's award for

pain and suffering must be based solely on an individualized assessment of Tucker's circumstances.

18. That said, the Court is tasked with "[using] its own judgment in determining from all the evidence . . . what would be a reasonable award for . . . damages [for pain and suffering]." *Berg v. Gunderson*, 147 N.W.2d 695, 703 (Minn. 1966). The Court's "own judgment" is inevitably informed by its own past cases and other cases of which it is aware. For example, the Court is aware that, in a recent case with very similar facts, the Fifth Circuit affirmed an award of $250,000 for pain and suffering (past and present) and $150,000 for loss of enjoyment of life[6] (past and present). *See Berry v. Auto-Owners Ins. Co.*, 634 F. App'x 960 (5th Cir. 2015). The plaintiff in *Berry* and Tucker had the same type of injury, caused by the same type of accident, treatable by the same surgical procedure, with roughly the same prognosis.

19. Tucker's future pain and suffering should be quite limited. RFAs have been successful in reducing or eliminating Tucker's pain, and the Court has already awarded Tucker sufficient funds to pay for one RFA per eight months for the next ten years. But Tucker will nevertheless experience some pain as the impact of each RFA wears off.

---

[6]Under Minnesota law, loss of enjoyment of life is a component of pain and suffering, and not a separate element of damages. *See Polyak v. Reus, Inc.*, No. C6-89-2038, 1990 WL 115102, at *1 (Minn. Ct. App. Aug. 14, 1990) ("Minnesota courts have never recognized loss of enjoyment of life as a separate element of damages.").

20. Having considered all of the evidence introduced at trial and all of the relevant factors identified by the Minnesota courts, the Court concludes that $200,000 will fairly compensate Tucker for future pain and suffering.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT plaintiff Sara Tucker shall recover a total of $397,411.83 from defendant United States of America, which represents (1) $9,718.43 for past medical expenses; (2) $125,000 for past pain and suffering; (3) $62,693.40 for future medical expenses; and (3) $200,000 for future pain and suffering.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 12, 2019   s/Patrick J. Schiltz
                            Patrick J. Schiltz
                            United States District Judge